Eric **HUMPHREY**, Respondent,

v.

Charles **GLENN** and Dale Glenn, d/b/a
C & D Glenn Farms, Appellants.

No. SC 86035.

Supreme Court of Missouri,
En Banc.

July 12, 2005.

681

Albert C. Lowes, Cape Girardeau, MO, for Appellants.

Fred H. Thornton, III, Sikeston, MO, for Respondent.

## LAURA DENVIR STITH, Judge.

Plaintiff Eric Humphrey, a trespasser, was severely injured when he drove his four-wheeler into an unmarked cable that defendants, the Glenns, had strung across their private road in an effort to keep trespassing vehicles off of their leased farm, Greenfield.[1] The trial court recognized the traditional rule that a possessor of land, such as the Glenns, owes no duty to trespassers. But, it held, Missouri would adopt the exception to this rule set out in Restatement (Second) of Torts section 335 (1965). That section imposes on the land's possessor a duty to use reasonable care to warn trespassers of the existence of and risk posed by a potentially dangerous artificial condition on the possessor's land if he or she is aware that trespassers constantly intrude on the limited area where the dangerous condition is located and would not be likely to discover it.

The court permitted Humphrey to submit this theory against the Glenns. The jury found for Humphrey, found Humphrey and the Glenns each to be 50 percent at fault, and awarded total damages of $100,000. The Glenns appealed. Following an opinion by the Court of Appeals, Southern District, this Court ordered transfer. Mo. Const. art. V, sec. 10. This Court holds that Missouri permits recovery under the theory set out in Restatement (Second) of Torts section 335, but the judgment is reversed and the case is remanded for a new trial due to instructional error.

## I. FACTUAL BACKGROUND

Charles and Dale Glenn are farmers in Mississippi County, Missouri, doing business as C & D Glenn Farms. Since 1994, the Glenns have leased Greenfield, a Mississippi County farm owned by Burke Dodson. Greenfield has two entrances, one referred to as the north entrance and the other as the south entrance, which are approximately one and one-half miles apart. They are located just off a road that runs along the top of a levee.

Since they first leased Greenfield, the Glenns have had problems with trespassers entering the property from the levee road and have been particularly concerned with trucks entering and making ruts in the fields. As soon as they began farming, they put a purple slash of paint on trees on either side of each entrance to warn trespassers to stay off the farm roads, in accordance with section 569.145, RSMo 2000. People continued to trespass. In an effort to further dissuade trespassers, the Glenns installed and maintained a 3/8–inch thick wire cable across each field road. The wire cable blocking the north entrance

---

1. Defendants Charles and Dale Glenn, doing business as C & D Glenn Farms, will be referred to collectively as "the Glenns."

was anchored to a railroad iron painted purple on one side of the road and connected to a tree on the other side in a fairly open area not far inside the north entrance. Because the trees grew close to the road near the south entrance, the Glenns strung the wire cable blocking the south entrance to Greenfield between two trees located approximately 140 to 145 yards down the road from the south entrance. They anchored down the cable in the middle by a two-foot chain attached to a steel pipe buried into the road. The cable could not be seen from the levee road. Although the Glenns had initially put signs on the cable to mark it, trespassers often removed the signs, leaving the bare cable unmarked.

On October 7, 2000, Eric Humphrey was riding a four-wheeler with a passenger. His brother was also operating a four-wheeler with a passenger. The group had been four-wheeling for several hours, and by sometime after 5 p.m. they noticed that their four-wheelers were running low on gas. While looking for a short cut to get to a gas station they believed was nearby, they turned off the levee road into the north entrance of Greenfield. They turned around when they came upon the wire cable across the road not far from the entrance. They continued down the levee road and soon saw the south entrance.

Taking the evidence in the light most favorable to the verdict, they did not see the six-year-old purple slash marks on the trees at the entrance, and thinking it was also a public road, Humphrey turned into it in the hope of finding a shortcut to the main road and gas station. He was operating his four-wheeler at approximately 20–25 mph and was 15 feet in front of the four-wheeler operated by his brother. There were no signs or flags or warnings of any type on the wire cable that day, and for reasons not clear from the record, the cable was not merely two feet off the ground, but was stretched across the road at close to head height for a person riding a four-wheeler.

None of those on the four-wheelers initially saw the cable. At some point, the passenger on the other four-wheeler saw the cable and yelled at Humphrey to watch out. The passenger on Humphrey's four-wheeler saw the cable when it was approximately two feet in front of the four-wheeler and yelled at Humphrey. Humphrey had not yet seen the cable, and as he turned to see why his friends were yelling at him, he drove the four-wheeler right into the cable. The wire cable was high enough above the ground that it hit him in the face and neck rather than hitting the four-wheeler—what the witnesses referred to as being clotheslined—resulting in serious physical injuries.

Humphrey filed suit against the Glenns, pleading negligence based on the theory set out in section 335 of the Restatement (Second) of Torts. The trial court ruled that Missouri would permit recovery under section 335, and the case proceeded to trial. Humphrey submitted Instruction No. 8, the verdict directing instruction, as follows:

> Your verdict must be for Plaintiff if you believe:
>
> First, Defendants knew or should have known that trespassers frequently intruded upon the south entrance to Greenfield, and
>
> Second, Defendants installed, placed, and/or maintained a wire cable across the road to the south entrance to Greenfield, and
>
> Third, Defendants knew or should have known that the wire cable was likely to cause serious bodily harm to trespassers, and
>
> Fourth, Defendants knew or should have known the wire cable was of such nature and location that Plaintiff would not discover it, and

Fifth, Defendant failed to use ordinary care to warn Plaintiff of the wire cable, and

Sixth, as a direct result of said failure, Plaintiff sustained damage.

The Glenns objected that Instruction No. 8 submitted that the trespass was frequent rather than constant and, thus, was erroneous even were Missouri to recognize section 335. The court overruled the objection. The jury returned a verdict for Humphrey, awarding him $100,000 in damages but assessing 50 percent of the fault to him. The Glenns appeal.

## II. ADOPTION OF RESTATEMENT (SECOND) OF TORTS SECTION 335

 "Under Missouri law, it is the status of one going on the land of another which establishes the legal framework by which the court determines the duty of care owed by the possessor." *Seward v. Terminal Railroad Ass'n of St. Louis,* 854 S.W.2d 426, 428 (Mo. banc 1993). Here, Mr. Humphrey concededly was a trespasser. "The general rule is that a possessor of land is not liable for harm caused to a trespasser by failure to put land in a reasonably safe condition." *Id. See also Carter v. Kinney,* 896 S.W.2d 926, 928 (Mo. banc 1995).

██ But, as *Seward* noted, Missouri has adopted other Restatement exceptions to the general "no duty" rule as to trespassers. For example, where the trespasser's presence becomes known, a duty of reasonable care is owed under Restatement (Second) of Torts sections 336, 337 (1965). *See Seward,* 854 S.W.2d at 428–29. Similarly, *Salanski v. Enright,* 452 S.W.2d 143, 144–46 & n. 1 (Mo.1970), held that a pos-

sessor of land owes a duty of care to child trespassers for a dangerous artificial condition he or she maintains at a place on the land that children are likely to trespass, as set out in Restatement (Second) of Torts section 339 (1965). In *Winegardner v. City of St. Louis,* 346 S.W.2d 219 (Mo. banc 1961), this Court reaffirmed its recognition of section 369 of the Restatement, the "hard-by rule," under which a landowner is held liable if he or she creates an artificial condition so close to the highway that it involves an unreasonable risk to . . . children because of their tendency to deviate from the highway. *Id.* at 220–21.

In *Seward,* this Court similarly was asked to adopt Restatement (Second) of Torts section 335, which recognizes a duty of a possessor of land to warn even adult trespassers where the possessor of the land knows that persons constantly trespass on a limited area of land on which the possessor maintains a dangerous artificial condition, if certain other specifically enumerated requirements are met. *Seward* did not reject the theory out of hand. Rather, after noting that section 335 had neither been adopted nor rejected in Missouri, the Court held that *Seward* was not the case in which to adopt it, because plaintiff had failed to show that defendant knew or should have known of constant trespassing in the area where the condition existed. *Id.* at 429–30.

Until the instant case, this Court has not had the occasion to address whether to adopt section 335 since *Seward.* The question has been presented to the court of appeals on a number of occasions over the last 10 years, but, as in *Seward,* because plaintiff had failed to make out a case under section 335, the issue was not reached in those cases.[2] The Glenns argue

---

**2.** *See, e.g., Hogate v. Am. Golf Corp.,* 97 S.W.3d 44, 48–49 (Mo.App. E.D.2002) ("regardless of the adoption of" section 335, the evidence failed to meet its requirements);

*City of Kansas City v. N.Y.-Kan. Bldg. Assoc. L.P.,* 96 S.W.3d 846, 861 (Mo.App. W.D.2002) (citing section 335 as an exception but finding it inapplicable); *Mothershead v. Greenbriar*

that in declining to reach the issue whether section 335 should be adopted, *Seward* and the cases cited *sub silencio* rejected the theory, for these cases could have adopted the theory if they had wanted to do so, even if they then found it inapplicable to the case before it. While those cases might have taken such an approach, the courts certainly were not required to do so. In the usual case, this Court does not determine whether to adopt a new theory or principle in a vacuum, but rather does so when it will have some real effect in the case before it. *Seward* and its progeny simply left the issue of adoption of section 335 to another, more factually appropriate case.

This is such a case. As discussed in section III below, the evidence presented was sufficient to make a submissible case on each element of section 335. The question is squarely presented whether Missouri should adopt that section, which states:

> A possessor of land who knows, or from facts within his knowledge should know, that trespassers constantly intrude upon a limited area of land, is subject to liability for bodily harm caused to them by an artificial condition on the land, if
>
> (a) the condition
>
> (i) is one which the possessor has created or maintains and
>
> (ii) is, to his knowledge, likely to cause death or serious bodily harm to such trespassers and
>
> (iii) is of such a nature that he has reason to believe that such trespassers will not discover it, and
>
> (b) the possessor has failed to exercise reasonable care to warn such trespassers of the condition and the risk involved.

Restatement (Second) of Torts section 335.

The principles set out in section 335 are consistent with Missouri law. While Missouri follows a general rule of no liability to trespassers, that rule "is based not on the wrongful nature of the trespasser's conduct, but on the landowner's inability to foresee the trespasser's presence and guard against injury." *Seward*, 854 S.W.2d at 428. For this reason, exceptions generally have been recognized in Missouri and elsewhere when "based on the existence of facts indicating that harm to trespassers should reasonably be anticipated by the landowner." *Id. See, e.g.*, Restatement (Second) of Torts sections 336, 337, and 339 (1965).

The reasons Missouri has adopted those exceptions to no-trespasser liability apply equally to the type of liability set out in section 335. It, too, is dependent on a showing that the possessor of the land should reasonably have anticipated that harm to trespassers was likely to result. This Court hereby adopts the exception to the no-duty rule set out in section 335 of the Restatement (Second) of Torts.

In adopting section 335, this Court does not hold that a possessor of land owes the same level of duty to trespassers that is owed to licensees or invitees. The duty is a limited one. The possessor of land cannot be found liable unless he or she created or maintained an artificial condition on land that was potentially dangerous to

---

*Country Club, Inc.*, 994 S.W.2d 80, 87–88 (Mo.App. E.D.1999) ("[t]his section of the Restatement has been considered on numerous occasions and the respective fact pattern failed to fulfill all of the requirements of the section," and holding it failed in that case also); *Cochran v. Burger King Corp.*, 937

S.W.2d 358, 365 (Mo.App. W.D.1996) (citing *Seward* and noting the exception provided in section 335, *inter alia*, did not apply). *Politte v. Union Elec. Co.*, 899 S.W.2d 590, 593 (Mo. App. E.D.1995) (finding the provision was not applicable to the case).

trespassers. Even then, liability will result only upon proof that: (1) the possessor knew or should have known of constant trespass in the limited area where the condition existed; (2) the possessor of the land knew the condition was likely to cause death or serious bodily harm to the trespasser; and (3) the condition was of such a nature that the possessor had reason to believe the trespasser would not discover the hazard. Even when these facts are shown, the possessor of land is not required to eliminate the condition, but is required to use reasonable care to warn the trespasser of the condition and the risk. Restatement (Second) of Torts section 335.

This limited exception to the "no duty" rule for a trespasser is consistent with Missouri's previously adopted exceptions to the rule. The majority of other states, when faced with a case to which section 335 would apply, have similarly adopted it, finding that public policy supports imposition of this limited duty to warn.[3] For the reasons just stated, this Court so determines also.

## III. APPLICATION OF SECTION 335

■ The Glenns argue that, even were Missouri to follow section 335, Humphrey failed to make a submissible case on many of the elements of that theory. They admit that they are possessors of the land and that they maintained the cable, an artificial condition. They also knew that there were trespassers on the land. In fact, they acknowledge that knowledge of trespassers is what led them to place and maintain the cable across the road, a cable they admit could cause serious injury if a person were "clotheslined" by it. But, they state, there was no evidence that they knew trespassers constantly intruded on

---

**3.** *See Maffucci v. Royal Park Ltd. P'ship*, 243 Conn. 552, 707 A.2d 15, 20–21 & n. 9 (1998) (stating, "[w]e agree with [section] 335 that liability in negligence for a dangerous condition on land will attach only if the possessor has actual or constructive knowledge that 'trespassers constantly intrude[d] upon a limited area of the land'" and "[w]e note that the recognition by this court of [section] 334 supports our conclusion that the materially identical language employed in [section] 335 should also be adopted" (citations omitted)); *Lindquist v. Albertsons, Inc.*, 113 Idaho 830, 748 P.2d 414, 416 (Ct.App.1987) (quoting section 335 and using it as the basis for holding that no duty was breached because all of the provision's requirements were not met); *Martin v. Spirit Mountain Recreation Area Auth.*, 566 N.W.2d 719, 721–23 (Minn.1997) (stating, "[f]or purposes of determining liability under section 466.03, Minnesota has adopted the standard of care owed to a trespasser found in the Restatement (Second) of Torts [section] 335 (1965)"); *Franc v. Penn. R.R.*, 424 Pa. 99, 225 A.2d 528, 529 (1967) ("[t]he duty of the railroad company in situations such as the one [in the case at bar] is spelled out in the Restatement of Torts [section] 335"); *State ex rel. Tex. Dep't of Parks & Wildlife v. Shumake*,

131 S.W.3d 66, 77, 80 (Tex.App.2003) (quoting section 335 for "the 'known trespasser' standard," and stating "[w]e rely on the second Restatement of Torts ... to impose on landowners a higher duty of care to known trespassers injured by artificial conditions that pose a risk of serious bodily harm of which the landowner knows or should know"); *Craighead v. Norfolk & W. Ry. Co.*, 197 W.Va. 271, 475 S.E.2d 363, 368 (1996) (noting the exception to the general rule of no duty to trespassers set forth section 335 was followed in West Virginia). *See also, Bennett v. Pub. Serv. Co. of N.H.*, 542 F.2d 92, 95 n. 1 (1st Cir.1976) (because New Hampshire law is consistent with section 335, "we think it permissible in determining how a New Hampshire court would decide this case to take supplementary notice of the Restatement"). *But see Pippin v. Atallah*, 245 Mich. App. 136, 626 N.W.2d 911, 915–16 (2001) ("the rationale of ... Restatement sections [335 and 337] has never been adopted in Michigan"); *Graham v. Sky Haven Coal, Inc.*, 386 Pa.Super. 598, 563 A.2d 891, 896 n. 8 (1989) ("[n]ot only has Section 335 not been adopted by this Court but it is contrary to the long[-]recognized rule in this Commonwealth," distinguishing *Franc* ).

this limited area. They further allege that their repeated placements of a warning sign on the cable and their 1994 placement of purple paint on nearby trees was sufficient to meet their duty to warn, that they should not be found to be at fault just because the signs were taken down and the cable was stretched so high across the road, and that the injury was caused by Mr. Humphrey's failure to keep a careful lookout, not by their failure to warn.

While the jurors could have accepted the Glenns' version of the facts, they were not required to do so. Viewing the facts in the light most favorable to the verdict, as this Court is required to do, *State v. Strong*, 142 S.W.3d 702, 710 (Mo. banc 2004), the evidence was sufficient to make a submissible case that the Glenns knew or should have known that trespassers constantly intruded on the south entrance, that trespassers would not discover the cable and that they had not taken reasonable care to warn trespassers of the danger.

In regard to the frequency of trespass, Robert Dale Glenn specifically testified that the Glenns had "constant problems" with trespassers on the Greenfield property and that he had been having "problems in this particular area before with trespassers," stating:

Q *I think I heard you refer to it as constant problems; is that correct?*

A *Yes, sir.*

Q When we say that, we are talking about specifically Greenfield?

A Yes, sir.

. . . .

Q *You have had problems in this particular area before with trespassers?*

A *Yes, sir.*

Q You know trespassers were using this area?

A Yes, sir.

. . . .

Q You knew people were using the land or would come on this land to ride four-wheelers and three-wheelers [when you put in the cable]?

A We knew that.

Dale Glenn's brother and co-owner of C & D Glenn Farms, Charles Glenn, confirmed:

Q Mr. Glenn, you have had problem with people trespassing on this property quite a while; is that right?

A Yes, sir.

Q Ever since you started farming it?

A Yes, sir.

Further, Dale and his cousin, Scott Glenn, testified that they knew trespassers intruded on the road since the time that Scott, a welder, had first chained the cable down to the ground. They put the cable across the road to keep out trucks but knew that four-wheelers would still trespass. They also knew that people who could not get through the cable would shoot up the signs or remove them and that when this occurred it would be difficult to see the cable. Dale testified:

Q How successful do you think the cable has been to keep people off the [property?]

A It is not going to keep people with four-wheelers out. We don't mind somebody riding four-wheelers, if we do have somebody in a four-wheeler. We just don't want them to drive trucks across a bean field.

He also stated:

Q Now was there any sign originally put on that cable?

A Yes.

. . . .

Q Why would you put the warnings on the cable, signs and such?

A So people could identify the cable, yes.

Q Would you agree that without any warnings on the cable it would be difficult or even impossible to see at times?

A It would be hard to see.

Scott testified:

Q You helped put up signs, haven't you?

A Yes.

Q Tell us, tell the jury what happened on one or more occasions to the signs?

A They shot them off the trees and off of a post with a shotgun.

Q Both north and south?

A Just the south end.

Charles similarly testified that they were "always hanging something" off the cable because people were constantly pulling the old signs down. Dale further expressly stated that he was aware that a person might not see the cable if there was no sign or other marking on it and could be "clotheslined" as a result:

Q Did it ever occur to you somebody was going to get clotheslined by the wire cable?

A Yes, we put signs on it. We don't want people to run in it and damage their vehicle or themselves.

And later Charles testified:

Q All right. Now, you boys are being beat up on the fact there were no flags or nothing they claim is down there where this kid ran where he shouldn't have been and got himself clotheslined. What efforts do you and your brother and your help for that matter try to take to ensure somebody sees the cable, even though they are trespassing?

A We always was hanging something there. There are boys, young, in their twenties that deer hunt. They will ride down and try to put something on it. You can look at the picture right there and there is a three-eights [sic] chain on it, with a three-eights cable I believe.

The Glenns knew that they needed to replace the destroyed or removed signs to avoid injury to those who might not see the naked cable, but if it got busy they might go weeks or months without checking to see if the signs were still up:

Q Mr. Glenn, you knew that people were riding four-wheelers around here whether with permission or without. You knew that cable was hard to see if there were no warning on it. You knew that people are taking off those warnings off [sic] and removed them from the cable and yet you still allowed that cable to remain in place where it was; is that right?

A We check it fairly often to keep the signs on it.

. . . .

Q During the off season, during this September, October period, how often would you boys get down to either of those locations?

A During the farming season we could be away from there quite a while with business elsewhere. You know, a week or two at [sic] time, or a month at a time. We are busy. We have got to be in the field every day, you know.

They also expressly stated that they knew the cable was dangerous and put signs on it to keep people from running into it:

Q You knew this wire cable was across the road and was a dangerous condition without any warnings on it; is that right?

A Yes.

. . . .

Q Why did you put warnings on the cable?

A Well, number one, to keep people from running up on it.

There was also evidence that, while the Glenns believed that the purple paint slashes they had placed on trees near the entrance to the south road should have warned trespassers they were on private land, they had not repainted the slashes since 1994.

This evidence made a submissible case on the issues whether there were constant trespassers in the limited area of the trespass, whether the Glenns were aware the cable was likely to cause death or serious injury if someone ran into it, whether they knew or should have known that the signs might have been taken down or fallen down and that, if so, a trespasser might not discover the cable, and that they failed to exercise reasonable care in checking the signs and replacing them or otherwise providing adequate warning of the condition and the risk involved to trespassers.[4] The trial court did not err in allowing the case to be submitted under the theory set out in section 335.

## IV. INSTRUCTIONAL ERROR

█ The Glenns are correct that the verdict directing instruction failed to correctly submit section 335, however. Rather than hypothesize that the Glenns knew that trespassers "constantly" intruded on their land, the verdict director required the jury to find only that trespassers "frequently" intruded on the south entrance of Greenfield. This was a contested issue, for while there was evidence that trespassers did constantly so intrude, there was also evidence from which the jury could have found that the intrusions along the south entrance, the area specified in the instruction, were merely frequent rather than constant. Defendants raised this deviation from section 335 at the instruction conference and preserved it in their motion for new trial and on appeal. Accordingly, the case must be remanded for a new trial at which the element of "constant" trespass will be properly submitted.

## V. CONCLUSION

For the reasons set out above, this Court adopts section 335 of the Restatement (Second) of Torts, but reverses the judgment and remands the case.

WOLFF, C.J., PRICE, TEITELMAN, LIMBAUGH and WHITE, JJ., and BLACKMAR, Sr.J., concur.

RUSSELL, J. not participating.

---

4. The Glenns also argue that the fact that the jury found plaintiff partially at fault means that the jurors believed he failed to keep a careful lookout, and that the injuries thus were caused by his failure to look for a condition he could have discovered. The facts shown permitted a finding of fault on the part of both parties. Whether plaintiff maintained a careful look out or was otherwise partially at fault was an issue for the jury to determine, and it did so by finding plaintiff 50 percent at fault. This was not inconsistent with also finding defendants 50 percent at fault.