

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

| | |
|---|---|
| LISA ANN FORD and | ) |
| DAVID JACOB FORD, | ) |
| Respondents, | ) |
| | ) |
| v. | ) WD81832 |
| | ) |
| FORD MOTOR COMPANY, | ) **FILED: June 25, 2019** |
| Appellant. | ) |

### Appeal from the Circuit Court of Clay County
### The Honorable Janet L. Sutton, Judge

### Before Division Two: Edward R. Ardini, P.J., and
### Alok Ahuja and Gary D. Witt, JJ.

David Ford's wife and son (the "Plaintiffs") brought a wrongful death suit against Ford Motor Company after Mr. Ford died as a result of injuries he suffered while working as a contractor at Ford Motor's Kansas City Assembly Plant. Mr. Ford was delivering vehicle seats to the plant when he was crushed between a stationary guard rail and a moving piece of machinery. The Plaintiffs alleged that Ford Motor was negligent for failing to remove or barricade the dangerous pinch point, or to effectively warn visitors of its existence. After an eight-day trial in the Circuit Court of Clay County, a jury found Ford Motor to have 95% comparative fault for Mr. Ford's injuries, and awarded the Plaintiffs $38 million in compensatory damages. The jury awarded the Plaintiffs an additional $38 million in aggravating circumstances damages.

Ford Motor appeals. It argues that the circuit court erred by:

(1)     preventing a key Ford Motor witness from testifying because he had not been adequately disclosed during discovery;

(2)     failing to direct a verdict for Ford Motor on the basis that Mr. Ford was a trespasser in the part of the plant where he was injured;

(3)     refusing to submit an instruction requiring the jury to determine whether Mr. Ford was trespassing;

(4)     failing to direct a verdict for Ford Motor on the basis that the pinch point presented an "open and obvious" danger;

(5)     refusing to submit a jury instruction on the "open and obvious" issue;

(6)     submitting an erroneous aggravating circumstances instruction; and

(7)     admitting evidence of other incidents involving the equipment which caused Mr. Ford's injuries.

We affirm.

## Factual Background[1]

David Ford was killed when he was crushed by machinery in the Kansas City Assembly Plant operated by Ford Motor in Claycomo, where Ford Motor assembles its F-150 model pickup truck. Mr. Ford was not employed by Ford Motor. Instead, he worked as a delivery driver for Walkenhorst Transportation, a trucking company. Walkenhorst had contracted with Ford Motor to deliver vehicle seats (manufactured by Johnson Controls in Riverside) to the Claycomo plant.

The Claycomo plant operated twenty-four hours a day, six days a week. Walkenhorst delivered seats to the plant in a constant loop, so that Ford Motor had an uninterrupted supply of seats during the entire duration of the assembly plant's operating hours. The seats delivered by Walkenhorst would be immediately integrated into the vehicle assembly process. On arrival at the Claycomo plant, Walkenhorst's delivery trucks would back into a loading dock, where pallets of seats

---

[1]     "We view the facts in the light most favorable to the jury's verdict." *Randel v. City of Kansas City*, 467 S.W.3d 383, 384 n.1 (Mo. App. W.D. 2015) (citation omitted).

2

were removed by a piece of equipment called a "seat stripper." The seat stripper consisted of an L-shaped pair of conveyor lines. The seat stripper operated in conjunction with a number of dual-pronged, ceiling-mounted carriers which resembled the mast system of a forklift. The carriers would pick up pallets of seats from a lift table at the end of one of the seat stripper's conveyor lines. The carriers would convey the pallets of seats to the assembly line so that the seats could be installed into trucks. Once the seats were delivered to the assembly line, the carriers would return the empty pallets to a lift table on the second conveyor line of the seat stripper. After the empty pallets were removed, the carriers crossed a gap between the lift tables at the end of the seat stripper's two conveyor lines, in order to pick up new pallets loaded with vehicle seats. A dangerous "pinch point" existed where the carriers traveled across the gap from one lift table to the other.

Evidence indicated that the seat stripper was one of the oldest pieces of equipment in the plant at the time of Mr. Ford's injury. One of the Plaintiffs' experts testified that the seat stripper was "a cobbled-together and inferior piece of equipment." The testimony indicated that the seat stripper frequently jammed, and had to be cleared by repositioning seats or pallets. Even when the seat stripper and carrier system were not malfunctioning, the testimony indicated that the carrier system frequently and unpredictably stopped, sometimes for several minutes at a time, and then resumed operation without any type of warning to workers. One of the Plaintiffs' experts, Franklin Darius, testified that "[e]rratic motion or intermittent motion is much more dangerous than consistent motion"; he testified that "if [machinery] can stop for a long period of time and then suddenly move without warning, it'll catch people by surprise." Darius testified that, unless it was physically isolated from workers, the carrier system should have issued an audible and/or visible alarm whenever it resumed its motion: "[i]f there's a possibility of a

3

human being [getting] caught off guard by the movement of the conveyor system, there must be an alarm of some type."

Mr. Ford was injured at the Kansas City Assembly Plant on December 8, 2015. At the time, he had been delivering seats to the plant for only 13 days. While delivering seats on December 8, Mr. Ford entered the area between the seat stripper's two conveyor lines to manually clear a fault or jam in the system. After telling a Ford Motor employee that he had cleared the fault, Mr. Ford stepped into the "pinch point" between the lift tables. Mr. Ford was pinned against a stationary guard rail by one of the dual-pronged carriers crossing from one of the seat stripper's lift tables to the other. A forensic pathologist retained by Plaintiffs, Dr. Judy Melinek, testified that the amount of force inflicted on Mr. Ford was comparable to the force inflicted in a "high-velocity motor vehicle accident[ ]" at approximately fifty or sixty miles per hour, or when an individual falls from a four-story building.

As a result of the crushing injury, Mr. Ford suffered fractures of his sternum, multiple ribs, and multiple thoracic vertebrae. The compression of Mr. Ford's thorax transected his inferior vena cava vein, and the vein had largely separated from the right atrium of his heart, causing massive bleeding in the pericardium, and compressing Mr. Ford's heart muscle. Mr. Ford underwent extensive open-heart surgery immediately following his injury.

Dr. Melinek testified that the amount of "bone-crushing pain" Mr. Ford experienced at the time of the accident caused him to lose consciousness. Although sedated, Mr. Ford was responsive to his family members and "not completely unconscious" following his thoracic surgery. Mr. Ford's surviving spouse, Plaintiff Lisa Ford, testified that "[h]e was in a lot of pain" while hospitalized; she testified that, "[i]t's not anything that you ever want to see." Mr. Ford was on a ventilator from the time of his surgery until the time of his death. Mr. Ford died on December

4

15, 2015, as a result of the traumatic blunt-force injuries he sustained on December 8.

On January 6, 2016, Mr. Ford's wife and son filed a wrongful death petition in the Circuit Court of Clay County against Ford Motor, in which they sought both compensatory and aggravating circumstances damages. The petition alleged that "[a]t all times relevant to this Petition, David Scott Ford was an invitee at the Ford Motor assembly plant." The petition alleged that the "conveyor belt and surrounding area of Ford Motor's assembly plant was not reasonably safe, in that it could cause serious injury to any person who was caught within the belt." The petition alleged that Mr. Ford's injuries were a "direct and proximate result of the negligence, carelessness, failure and violations of Ford Motor to exercise ordinary care . . . to remove the dangerous condition on its property and/or to warn visitors such as David Scott Ford of its existence."

An eight-day jury trial was held beginning on February 13, 2018. At trial, a key issue was whether Mr. Ford was authorized to enter the seat stripper system or whether he was an unauthorized trespasser at the location where he was injured. Although Ford Motor presented several witnesses who testified that Walkenhorst drivers were not authorized to enter the seat stripper, Plaintiffs introduced evidence that Walkenhorst drivers routinely entered the machine, that Ford Motor expected the Walkenhorst drivers to clear jams in the seat stripper themselves without summoning Ford Motor employees, and that Ford Motor managers and employees were aware of this practice. Thus, David Martin, the former Head of Operations at Walkenhorst, testified that a delivery driver could "seldom get through a trailer load without having to [access the seat stripper area], and pull a pallet or something that would get lodged in there sideways or stuck." Martin testified that Ford Motor managers witnessed Walkenhorst's drivers accessing the interior portion of the seat stripper system, and that occasionally Ford Motor employees would assist the

5

Walkenhorst drivers in fixing a seat stripper fault. Martin testified that Ford Motor employees had placed hooks, ladders, and poles at various locations near the seat stripper so that drivers could more easily fix a jam in the system, and that Ford Motor had even placed several chairs in the interior portion of the seat stripper for drivers to sit in as the seats from their trucks were unloaded.

Walkenhorst driver Stephen Andrews testified that Ford Motor's maintenance employees expected delivery drivers to fix a stuck pallet or seat by freeing it with a hook, and that the Ford Motor employees would "get a little irritated" if they were called "to do this misdemeanor little thing that you guys could fix." Andrews said that Ford Motor employees routinely saw him standing on the interior of the seat stripper, but none of the employees ever reproached him, or told him not to access the seat stripper. Andrews said that he was instructed to "do whatever's necessary to keep the line moving, that's part of the service you provided to Ford [Motor]."

Another delivery driver, Scott Brown, testified that he would sit on the inside of the seat stripper while his truck was unloading, so that he could more easily clear jams. Brown testified that he never shut down the machine before attempting to unclear a jam, nor did anyone ever train him on how to shut the seat stripper down. Brown said that one of his trainers told him, "Do whatever you got to do to keep the line going. If you can't get it fixed, hit the call button."

Finally, Walkenhorst delivery driver Rick Allen testified that in his 14 years of experience, he would routinely enter the seat stripper in order to fix faults or jams. Allen estimated that, on average, he fixed jams in the seat stripper approximately ten times during a twelve-hour shift. Allen said that he would occasionally call the Ford Motor maintenance team for assistance in clearing a jam, but that the maintenance workers were "pretty slow," sometimes taking as long as thirty minutes to respond to a call. Allen testified that he never saw a sign that

6

stated the seat stripper was for "authorized personnel only," nor was he ever warned not to enter the seat stripper system.

Evidence was also presented at trial that other persons had been injured at the pinch point where Mr. Ford suffered his fatal injury, or had narrowly avoided injury. In 1996, just one year after the seat stripper was installed, the maintenance foreman of the plant, Stephen Bray, was caught in the pinch point and crushed, causing a broken rib. A nearby electrician hit a kill switch when he saw that Bray was pinned against the guard rail. If the electrician had not shut down the line, Bray acknowledged that he "wouldn't have walked away from it."

Less than six months before Mr. Ford's accident, Timothy Van Vickle, a Ford Motor electrician, narrowly avoided an injury in the pinch point. Van Vickle testified that he was working as an apprentice in the seat stripper with a journeyman, near where Mr. Ford was injured. Van Vickle testified that his journeyman warned him to step back because the area was dangerous. Van Vickle "backed up and they . . . watched that thing cross over." He acknowledged that, if he had not been told to step away, "that could have been [him] who was killed." Van Vickle testified that "you get tunnel vision when you're focused so you're not really looking at your surroundings."

Another incident occurred in September 2015, approximately three months before Mr. Ford was killed. In that incident a Walkenhorst driver named Sal Cangelosi had entered the seat stripper to fix a fault. While Cangelosi was standing in the pinch point area, a carrier unit came towards him. Another Walkenhorst driver who was nearby, described as a "pretty good sized guy," grabbed the carrier and yelled at Cangelosi, who moved away. The carrier hit Cangelosi's shoulder as it went by, and both he and the other driver suffered minor injuries as a result of the incident. After hearing about the incident, a Ford Motor maintenance employee

7

told Cangelosi that he was "lucky," because the pinch point could have "hurt him" more seriously.

The Plaintiffs also presented evidence that indicated that Ford Motor was aware of the dangers presented by the pinch point, and that it had failed to follow its own policies, industry standards, and applicable regulations when it failed to remove, or adequately barricade or warn of, the pinch point. Thus, Plaintiffs presented evidence that when the seat stripper was installed in 1995, Ford Motor policy required that a risk assessment be conducted, but it was not. "[T]he first question" on the risk assessment would have been to identify any pinch points in the equipment. Plaintiffs also presented evidence that such a risk assessment should have been conducted – but was not – following Stephen Bray's injury accident in 1996. Further, Plaintiffs presented evidence that, as a result of citations issued during a "wall-to-wall" inspection conducted by the Occupational Safety and Health Administration (OSHA) in 1999, Ford Motor entered into a settlement in which it agreed to "conduct a joint risk analysis [with the United Auto Workers union] of all crossover locations in the facility by January of 2000 to determine which areas needed guarding." Plaintiffs also presented evidence that, as part of a comprehensive safety audit in 2007–2008, Ford Motor employees identified, or should have identified, the pinch point in the seat stripper as an area requiring additional guarding.

After the Plaintiffs rested, Ford Motor attempted to call their corporate representative at trial, John Lawson, to testify as a fact witness. Plaintiffs objected on the basis that Lawson's name had not been disclosed in response to Plaintiffs' Interrogatory 4, which required Ford Motor to identify "every person who has any knowledge or information about Plaintiffs' claims set forth in the pleadings." Plaintiffs contended that the interrogatory had required Ford Motor to identify all of the witnesses it intended to call at trial. Although Lawson had not been disclosed

8

in response to Interrogatory 4, he had served as one of Ford Motor's designated representatives during a deposition of the corporation conducted pursuant to Supreme Court Rule 57.03(b)(4). (The deposition was conducted on January 25, 2018, less than three weeks before trial began on February 13.) Ford Motor argued that the corporate representative deposition had given the Plaintiffs adequate notice of Lawson's planned testimony. For their part, the Plaintiffs argued that they had not deposed Lawson in his personal capacity, and would have prepared differently for a personal deposition, and would have conducted such a deposition earlier in the discovery process. The circuit court sustained Plaintiff's objection, and prohibited Lawson from testifying.

After the first phase of trial, the jury assessed 95% of the fault for Mr. Ford's death to Ford Motor, and awarded the Plaintiffs $38 million in compensatory damages. The jury also found that Ford Motor's conduct satisfied the substantive standard for an award of aggravating circumstances damages. Following a second phase of trial, the jury awarded the Plaintiffs an additional $38 million in aggravating circumstances damages. The trial court entered its final judgment on February 26, 2018, awarding Plaintiffs the total sum of $74.1 million. After the denial of its post-judgment motions, Ford Motor filed this appeal.

**Analysis**

**I.**

In its first Point, Ford Motor argues that the trial court erred when it refused to allow Ford Motor's corporate trial representative, John Lawson, to testify during the first phase of trial. The trial court excluded Lawson because Ford Motor had not identified him in response to an interrogatory asking it to identify those persons with "any knowledge or information about Plaintiffs' claims set forth in the pleadings."

9

"'Trial courts have broad discretion in administering rules of discovery, which this Court will not disturb absent an abuse of discretion.'" *State ex rel. BNSF Ry. Co. v. Neill*, 356 S.W.3d 169, 172 (Mo. 2011) (quoting *State ex rel. Delmar Gardens N. Operating, LLC v. Gaertner*, 239 S.W.3d 608, 610 (Mo. 2007)). A trial court abuses its discretion when the court's ruling is "clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *Lewellen v. Franklin*, 441 S.W.3d 136, 149 (Mo. 2014) (citation and internal quotation marks omitted). "The trial court has broad discretion in admitting or excluding testimony on the basis of nondisclosure in interrogatories." *DeLaporte v. Robey Bldg. Supply, Inc.*, 812 S.W.2d 526, 533 (Mo. App. E.D. 1991); *see also, e.g., Jones v. City of Kansas City*, 569 S.W.3d 42, 61 (Mo. App. W.D. 2019).

Plaintiffs' Interrogatory 4, served on March 24, 2016, made the following request:

> Please state the <u>name, address, telephone number, employer, title, and occupation</u> [of] each and every person who has any knowledge or information about Plaintiffs' claims set forth in the pleadings, who witnessed the Incident, was present at the scene, or arrived thereafter, and what defendant believes they witnessed; or has knowledge or information about David Ford's condition or actions prior to the Incident, and what information defendant believes he or she has.

Ford Motor responded to Interrogatory 4 on April 22, 2016, identifying approximately 30 people. The company's response objected to Interrogatory 4 on several grounds: that several of the identified individuals were represented by counsel, and therefore could only be contacted through counsel; that the nature of each person's knowledge was a more appropriate topic for deposition testimony rather than a narrative interrogatory response; and that the interrogatory would require Ford Motor to speculate concerning Mr. Ford's actions before his accident. Notably, Ford Motor did not object to Interrogatory 4 on the basis that it was

10

overbroad, vague, or confusing (although it did assert a general objection directed at all of the Plaintiffs' interrogatory requests on this basis). Ford Motor did not identify John Lawson in its April 2016 response to Interrogatory 4.

In a series of e-mail exchanges, Plaintiffs' counsel made it clear that they intended to depose each and every one of the fact witnesses identified by Ford Motor in response to Interrogatory 4. On February 23, 2017, Plaintiffs' counsel sent the following e-mail to counsel for Ford Motor:

> Our firm has served various discovery requesting [*sic*] requiring Ford to list all people with potentially relevant information. You are right in your belief that we have asked for and intend to depose every one of those individuals.
>
> [I]f you identify a previously undisclosed fact witness we ask that you comply with the rules by supplementing your discovery responses. In such case, it is our intent to take the deposition as set forth above.

In an e-mail dated November 2, 2017, Plaintiffs' counsel stated,

> We have requested and are again requesting to take the depositions of any and all current or former Walkenhorst, JCI, Universal, Ford Employees, First Responder and/or treaters who have relevant information – unless Ford Motor Company agrees not to call them at trial.

Ford Motor filed a supplemental response to Interrogatory 4 on December 15, 2017. That supplemental response did not identify John Lawson as a potential witness.

Plaintiffs' counsel provided further notice of the need to disclose potential witnesses during a hearing on January 3, 2018, five weeks before trial began on February 13. At the hearing, counsel stated that he would seek to exclude at trial any witness who was not disclosed by Ford Motor in the course of discovery:

> The last matter, and that I believe – matter of fact, I know that in light of the Court's rulings that this is understood, but just for the record I want to say, we're going to work with them to narrow the list of witnesses down. But at some point, we're going to file a motion in limine that says, look, they've identified these witnesses. If they

11

haven't made them available for deposition, or they haven't otherwise disclosed them, that they be excluded.

I guess it's just more – it's not really asking for any kind of ruling other than to put opposing counsel on notice. If they have people they're planning to call, who they should have disclosed in response to discovery, the time to do that is now so we're not, the week of trial, scrambling around dealing with later [disclosed] witnesses.

Ford Motor still did not disclose John Lawson, nor did it ask for any clarification regarding the nature of the required disclosures.[2]

Despite clear and repeated notifications that Interrogatory 4 required it to disclose the fact witnesses that it intended to call at trial, Ford Motor failed to supplement its response by disclosing John Lawson as a fact witness. Plaintiffs' first notice that Ford Motor intended to call Lawson as a fact witness came on the first day of trial, when he was identified on a Ford Motor witness list.

In its oral ruling sustaining Plaintiffs' objections to Lawson's testimony, the circuit court noted that, despite "extensive interrogatories submitted on both sides" over the course of approximately two years, Lawson was not disclosed until less than one month before trial, and even then he was disclosed merely as a corporate representative to testify at a Rule 57.03(b)(4) deposition. The court noted that Ford Motor never attempted to supplement its interrogatory responses by identifying Lawson as a fact witness, and only did so on the first day of trial.

---

[2]     Ford Motor argues that, during a January 31, 2018 motions hearing, the parties and the court expressed confusion as to what Interrogatory 4 required. Although Plaintiffs' counsel at that hearing contended that *Ford Motor* had not asked comprehensive interrogatories which required *Plaintiffs* to disclose all of their trial witnesses, Plaintiffs argued that *they* had served such discovery. The relevant exchange closed with the following understanding:

THE COURT:  I don't think either side wants either side calling somebody that's not been named in an interrogatory and disclosed to the other side.

DEFENDANT'S COUNSEL:  (Nodding head.)

PLAINTIFFS' COUNSEL:  If there was an interrogatory that was asked.

THE COURT:  Right.  Correct.

12

The circuit court did not abuse its "broad discretion" when it concluded that Lawson should have been disclosed in response to Interrogatory 4, because Lawson "ha[d] . . . knowledge or information about Plaintiffs' claims set forth in the pleadings." Lawson testified during the corporate representative deposition that he played a primary role investigating Mr. Ford's accident, starting immediately after the accident occurred. He was designated by Ford Motor to give deposition testimony on the company's behalf with respect to the facts of the accident; Ford Motor's investigation of the accident and its conclusions as to the accident's cause; any discipline of employees as a result of Mr. Ford's accident; any subsequent remedial measures Ford took as a result of the accident; the design and operation of the seat stripper and carrier system; and safety reviews and prior injuries involving that machinery.

Ford Motor argues that it interpreted Interrogatory 4 as calling for the identification only of witnesses who witnessed Mr. Ford's accident, or its immediate aftermath. But Interrogatory 4 was not limited to such witnesses; it asked Ford Motor to identify "each and every person who has any knowledge or information about Plaintiffs' claims set forth in the pleadings." Ford Motor's current argument is belied by its own conduct during discovery. Before trial, Ford Motor disclosed three categories of witnesses in response to Interrogatory 4: (1) persons who responded directly to the scene; (2) persons who provided care to Mr. Ford directly following the accident; and (3) persons who participated in the investigation of the accident. Thus, it is clear that Ford Motor did not interpret Interrogatory 4 as limited to individuals who personally witnessed the accident or its aftermath.

Even though Lawson should have been disclosed in response to Interrogatory 4, however, a "failure to correct or supplement [a discovery response] may not, in all circumstances, be fatal to the answering party's cause." *Crompton v. Curtis-Toledo, Inc.*, 661 S.W.2d 645, 650 (Mo. App. E.D. 1983) (citation and internal quotation

13

marks omitted). "Even where this duty to supplement has been established, prior to imposing sanctions on the errant party 'the trial court will first determine whether in the particular situation the opposing party has been prejudiced.'" *Id.* (citations omitted).

> In making a determination as to prejudice to the adversary the trial court should not ignore the spirit of the rule; i.e. that the rules of discovery were designed to eliminate, as far as possible, concealment and surprise in the trial of law suits to the end that judgment therein be rested upon the real merits of the causes and not upon the skill and maneuvering of counsel.

*Id.*

> [I]n cases where a party is surprised and prejudice could have resulted [from a party's failure to disclose a witness], the [trial] court will have to determine, in its discretion, whether to exclude the evidence, or to continue the case, or whether under some circumstances it would be sufficient to recess the case long enough to permit the complaining party to make necessary inquiry and investigation.

*Laws v. City of Wellston*, 435 S.W.2d 370, 375 (Mo. 1968).

In this case, the circuit court did not abuse its "broad discretion" in choosing to exclude Lawson from testifying as a fact witness in the first phase of trial. On appeal, Ford Motor argues that the Plaintiffs <u>did</u> depose Lawson, because he was one of Ford Motor's designated representatives at the organizational deposition conducted under Rule 57.03(b)(4). Plaintiffs' counsel argued to the trial court, however, that Lawson's identity as Ford Motor's corporate representative on certain deposition topics was only disclosed a couple of days before the deposition. Counsel argued that he would have taken Lawson's deposition earlier, and would have prepared and conducted the deposition differently, if he had known that Lawson would be a fact witness at trial. Plaintiffs' counsel argued:

> We did not take Mr. Lawson's deposition. We took the deposition of Ford Motor Company. He was speaking on behalf of Ford Motor Company. During that deposition, we asked him about the

14

position of Ford Motor Company. He weaved in and out during that deposition between things that were told to him.

As a corporate rep, he can pull information from everyone. Now, the fact that pieces of that has to go to his individual knowledge, there's no – they had an obligation under the rules then to disclose him. And had they disclosed him under the rules to our interrogatory, we would have taken him last year and we would have gone through these 60,000 pages of documents, find out what emails he had, what information he had. He would have told us things. We would have gone down those avenues. We didn't do any of that.

They told us about Mr. Lawson a day or two before his corporate rep deposition. And he came in and testified as a corporate rep. I did not ever once in my life prepare to take John Lawson's deposition in his individual capacity. I am not prepared here to cross-examine him in his individual capacity. I have not reviewed his emails. I have not reviewed his documentation. I have not reviewed all the correspondence of his, and so there would be extreme prejudice.

It may be that, because Lawson was a designated Rule 57.03(b)(4) representative witness for Ford Motor, he was required to provide information within his personal knowledge in responding to questioning by Plaintiffs' counsel. But even if Plaintiffs' counsel was entitled to examine Lawson concerning his personal knowledge, "[t]he purpose of deposing a corporate representative is not to uncover the representative's personal knowledge or recollection of the events at issue." *State ex rel. Reif v. Jamison*, 271 S.W.3d 549, 551 (Mo. 2008). Instead, "the testimony of the corporate representative designated pursuant to Rule 57.03(b)(4) is not the deposition of that individual for his or her personal recollections or knowledge but is instead 'the deposition of the corporate defendant.'" *Id.* (citation omitted). While Plaintiffs' counsel may have been entitled to explore Lawson's personal knowledge, that was not the purpose of the deposition.

In addition, in this case Plaintiffs' counsel engaged in exhaustive pretrial preparation, deposing *every* individual disclosed by Ford Motor in response to Interrogatory 4. Plaintiffs ultimately conducted more than sixty total depositions. In light of these painstaking discovery efforts by Plaintiffs' counsel, the circuit court

15

was entitled to credit counsel's statement that he would have engaged in more thorough – and different – preparation if he had known that Lawson was a potential fact witness (for example, by reviewing all of the voluminous discovery documents authored by or transmitted to Lawson). Given the short notice between Lawson's identification as a corporate designee and the Rule 57.03(b)(4) deposition, the circuit court could conclude that the Plaintiffs were prejudiced by being denied the opportunity to engage in the level of preparation they had conducted prior to the numerous fact-witness depositions they had taken. The trial court could also reasonably conclude that, if Plaintiffs had been given the opportunity to depose Lawson as an individual fact witness earlier, Plaintiffs may have discovered the identity of additional witnesses whom they would have deposed, or other lines of investigation they would have pursued. Ford Motor's claims that Lawson was its key witness only heighten the prejudice to Plaintiffs (who were denied the opportunity to depose him in his individual capacity). The circuit court could justifiably conclude that Plaintiffs should not be disadvantaged by Ford Motor's failure to disclose its key fact witness prior to the first day of trial.

The trial court could also conclude that because the case was specially set for trial, granting a continuance of the trial was not a reasonable option in response to Ford Motor's belated disclosure of Lawson. Moreover, in the context of an eight-day jury trial in a complex case, the circuit court in its discretion could determine that it was not reasonable to expect Plaintiffs' counsel to prepare for, and conduct, a deposition of an important – but untimely disclosed – fact witness while trial progressed.[3]

---

[3]  Ford Motor cites *Dane By Dane v. Cozean*, 636 S.W.2d 87 (Mo. App. E.D. 1982), and *Claude T. v. Claire T.*, 579 S.W.2d 141 (Mo. App. E.D. 1979), to argue that a circuit court errs when it refuses to allow an undisclosed witness to testify following a recess. In both *Dane* and *Claude T.*, a party failed to disclose a witness in response to an interrogatory; despite the nondisclosure, the trial court in each case permitted the undisclosed witness to testify after a recess which allowed the opposing party to depose the

16

Point I is denied.

## II.

In its second Point, Ford Motor argues that the trial court erred in denying its motions for directed verdict and for judgment notwithstanding the verdict. Ford Motor contends that the evidence at trial established – as a matter of law – that Mr. Ford was a trespasser when he entered the seat stripper, and thus that Ford Motor owed him no duty of care. Although Ford Motor concedes that Mr. Ford entered the plant as its business invitee, it argues that Mr. Ford exceeded the scope of the invitation when he entered the seat stripper, and thus became a trespasser.

In reviewing a trial court's denial of motions for judgment notwithstanding the verdict or for a directed verdict, we determine "whether the plaintiff made a submissible case." *Med. Plaza One, LLC v. Davis*, 552 S.W.3d 143, 153 (Mo. App. W.D. 2018) (citation and internal quotation marks omitted). "In order to make a submissible case a plaintiff must present substantial evidence for every fact essential to liability." *Id.* (citation and internal quotation marks omitted).

> A case may not be submitted unless each and every fact essential to liability is predicated on legal and substantial evidence. Whether the plaintiff made a submissible case is a question of law that this Court reviews de novo. To determine whether a directed verdict or judgment notwithstanding the verdict should have been granted this Court applies essentially the same standard. To determine whether the evidence was sufficient to support the jury's verdict, an appellate court views the evidence in the light most favorable to the verdict. A motion for directed verdict or JNOV should be granted if the defendant shows that at least one element of the plaintiff's case is not supported by the evidence.

witness. *See Dane*, 636 S.W.2d at 90; *Claude T.*, 579 S.W.2d at 143. The circuit court's ruling was affirmed in both cases, with the appellate court noting that "[t]he guiding rule in this issue is that examination of a witness whose name has not been disclosed, though requested, is a matter resting within the sound discretion of the trial court." *Dane*, 636 S.W.2d at 90; *see also Claude T.*, 579 S.W.2d at 143. While *Dane* and *Claude T.* found no abuse of discretion where a trial court permitted an undisclosed witness to testify, nothing in those decisions suggests that the circuit court was *required* to permit the testimony, or that a trial recess is *always* an appropriate remedy for a witness' late disclosure.

*Holmes v. Kansas City Pub. Sch. Dist.*, 571 S.W.3d 602, 611 (Mo. App. W.D. 2018) (quoting *Ellison v. Fry*, 437 S.W.3d 762, 768 (Mo. 2014)).

A person generally enters another person's land with a legal status falling within one of three broad categories: that of a "trespasser, licensee, or an invitee." *Medley v. Joyce Meyer Ministries, Inc.*, 460 S.W.3d 490, 495 (Mo. App. E.D. 2015) (citation omitted). "When a plaintiff sues a possessor of land for injuries arising out of an unreasonably dangerous condition on that land, the relationship between the possessor of the land and the plaintiff determines the standard of care owed the plaintiff." *Christian v. St. Francis Med. Cntr.*, 536 S.W.3d 356, 358 (Mo. App. E.D. 2017) (citation omitted).

An invitee is a person who "enters the premises of another with the consent of the possessor for some purpose of benefit or interest to the possessor, or for the mutual benefit of the invitee and the possessor." *Id.* (citation omitted). If a visitor is an invitee, the possessor of the land may be liable for the visitor's injuries if the visitor shows that "1) a dangerous condition existed on the premises that was not reasonably safe; 2) the possessor knew of the condition, or through the use of ordinary care should have known of it; and 3) the possessor failed to use ordinary care to remove, remedy, or warn of the dangerous condition." *Id.* (citation omitted).

On the other hand, a person is generally a "trespasser" if they enter without the landowner's permission. *Wilson ex rel. Wilson v. Simmons*, 103 S.W.3d 211, 218 (Mo. App. W.D. 2003). With certain exceptions (one of which we discuss in § III, below), "the possessor owes a trespasser no duty of care." *Id.* at 219 (citation omitted).

When a theory of liability is premised on "invitee" status, a person must show that they remained an "invitee" at the time of the injury:

> [I]t is incumbent upon the plaintiff to show, not only that her entry upon the premises was by invitation of the owner, but also that

18

> *at the time the injury was received, she was in that part of the premises into which she was invited to enter, and was using them in a manner authorized by the invitation, whether express or implied.*

*Gruetzemacher v. Billings*, 348 S.W.2d 952, 958 (Mo. 1961) (quoting *Glaser v. Rothschild*, 120 S.W. 1, 4 (Mo. 1909) (emphasis added in *Gruetzemacher*)). "Deviation from an invitation occurs when the entrant acts in a manner inconsistent with the scope of an express or implied invitation . . . ." *Hogate v. Am. Golf Corp.*, 97 S.W.3d 44, 48 (Mo. App. E.D. 2002) (citation and internal quotation marks omitted) (finding that a bicyclist who was an invitee in a public park became a trespasser when he entered a golf course located within the park).

"[T]he test for whether certain conduct constitutes an invitation is not what the possessor of land *intended,* but what a *reasonable man would interpret* the conduct to mean." *Singleton v. Charlebois Const. Co.*, 690 S.W.2d 845, 848 (Mo. App. W.D. 1985) (citing RESTATEMENT (SECOND) OF TORTS § 332 cmt. c (1965)); *accord Taylor v. Union Elec. Co.*, 826 S.W.2d 57, 59 (Mo. App. E.D. 1992). An "invitation 'may be implied from dedication, customary use, or enticement, allurement, inducement to enter or manifested by the arrangement of the premises or the conduct of the owner.'" *Schumacher v. Barker*, 948 S.W.2d 166, 170 (Mo. App. E.D. 1997) (quoting *Singleton*, 690 S.W.2d at 848). "Any words or conduct of the possessor which lead or encourage the visitor to believe that his entry is desired may be sufficient for the invitation." *Taylor*, 826 S.W.2d at 59 (quoting *Singleton*, 690 S.W.2d at 848)); *see also Mobley v. Webster Elec. Co-op.*, 859 S.W.2d 923, 928 (Mo. App. S.D. 1993).

Plaintiffs presented substantial evidence that Mr. Ford was a Ford Motor invitee at the place where he was injured, and was not acting in excess of the invitation he had been given. As described in our factual statement above, several Walkenhorst employees testified that they routinely accessed the interior portion of the seat stripper in order to fix faults and jams, with the knowledge of Ford Motor

19

employees (including management-level employees). These witnesses testified that Ford Motor supplied them with tools to clear jams in the seat stripper, and provided them with chairs in the interior of the seat stripper in which to sit while their trucks were unloaded. The testimony indicated that Walkenhorst drivers had fixed faults in the seat stripper with the assistance of Ford Motor employees, and that some Ford Motor employees had expressed frustration when Walkenhorst drivers did not fix faults in the equipment themselves. Two different Walkenhorst drivers testified that they had been instructed to do whatever was necessary to keep the system operating, and to summon Ford Motor employees for assistance only if they could not fix the problem themselves. The testimony also indicated that Ford Motor had not placed any signs restricting Walkenhorst drivers from entering the seat stripper, had not verbally instructed or warned the Walkenhorst drivers not to do so, and had not placed a barricade or gate at the point at which Mr. Ford entered the seat stripper (which the evidence indicated was a common access point).

Although management employees of Ford Motor testified that Walkenhorst drivers were not authorized to enter the interior of the seat stripper, Plaintiffs presented substantial evidence that Mr. Ford was an invitee at the location where he was injured. The circuit court did not err in denying Ford Motor's motions for directed verdict and for judgment notwithstanding the verdict on the basis that Mr. Ford was a trespasser as a matter of law.

Point II is denied.

### III.

In its third Point, Ford Motor argues that the circuit court erred when it refused to submit an instruction directing the jury to return a verdict for Ford Motor if it determined that Mr. Ford was a trespasser. Ford Motor maintains that even if Mr. Ford was not a trespasser as a matter of law, there was a genuine

20

factual dispute concerning Mr. Ford's status, and the issue should have been submitted to the jury for decision.

> The trial court's refusal to submit a party's proffered instruction to the jury is a matter that this Court reviews *de novo*. *Cluck v. Union Pacific R. Co.*, 367 S.W.3d 25, 32 (Mo. banc 2012); *Marion v. Marcus*, 199 S.W.3d 887, 893 (Mo. App. W.D. 2006). We evaluate whether the proffered instruction was supported by the evidence and the law. *Id.* An instruction must correctly state the law. *SKMDV Holdings, Inc. v. Green Jacobson, P.C.*, 494 S.W.3d 537, 555 (Mo. App. E.D. 2016). It is not error for a trial court to refuse to give a requested instruction that is incorrect. *Id.* at 555–56.

*Barth v. St. Jude Med., Inc.*, 559 S.W.3d 923, 925 (Mo. App. E.D. 2018). "In circumstances where no approved instruction applies, Rule 70.02(b) allows for the use of not-in-MAI instructions. However, the not-in-MAI instruction must follow the applicable substantive law." *Id.* (citing *Am. Equity Mortg., Inc. v. Vinson*, 371 S.W.3d 62, 64–65 (Mo. App. E.D. 2012)).

Generally, in a premises liability case like this one, "[t]he scope of a defendant's duty is a question of law for the court to resolve." *Tharp v. St. Luke's Surgicenter-Lee's Summit, LLC*, No. SC 96528, 2019 WL 925542, at *3 (Mo. Feb. 26, 2019); *accord Coomer v. Kansas City Royals Baseball Corp.*, 437 S.W.3d 184, 199 (Mo. 2014). But when the facts surrounding an entrant's status on the land are in dispute, "[a] party is entitled to a verdict-directing instruction predicated on his theory of the case . . . ." *Adams v. Badgett*, 114 S.W.3d 432, 436 (Mo. App. E.D. 2003) (citation omitted).

Even if we assume that the evidence at trial presented a disputed factual issue concerning Mr. Ford's status at the time and place of his injury, the circuit court did not err in refusing Ford Motor's proffered instruction, because that instruction did not correctly state the substantive law. Ford Motor offered the following instruction (Refused Instruction G):

21

Your verdict must be for the defendant if you believe that at the time of the accident, David Ford was in a part of the Kansas City Assembly Plant that defendant had not given him permission to enter.

Refused Instruction G would have told the jury that they were required to return a verdict for Ford Motor, if they found that Ford Motor had not given Mr. Ford permission to enter the place where he was injured.

Ford Motor's proffered instruction presumes that possessors of land owe _no_ duty to trespassers, in _any_ circumstances. But that is not Missouri law. As relevant here, § 537.351, RSMo, which was enacted in 2012, provides:

> 2. A possessor of real property may be subject to liability for physical injury or death to a trespasser in the following situations:
>
> . . . .
>
> (2) The possessor knew or should have known that trespassers consistently intrude upon a limited area of the possessor's land where the trespasser was harmed, the harm resulted from a dangerous artificial condition on the land; and
>
> (a) The possessor created or maintained the artificial condition that caused the injury;
>
> (b) The possessor knew that the condition was likely to cause death or serious bodily harm to trespassers;
>
> (c) The possessor knew or should have known that the condition was of such a nature that trespassers would not discover it; and
>
> (d) The possessor failed to exercise reasonable care to warn trespassers of the condition and the risk involved.

*See also Humphrey v. Glenn*, 167 S.W.3d 680, 683–85 (Mo. 2005); MAI 22.10 (7th ed. 2018). Even if the jury were to have concluded that Mr. Ford was a trespasser, that finding alone would not necessarily have negated Ford Motor's liability for his death.

In the context of this case, Ford Motor's proffered instruction also had the potential to mislead the jury when it asked jurors to consider only whether Ford Motor had "given [Mr. Ford] permission to enter" the seat stripper area. As

22

discussed in § II above, a possessor's conduct may create an invitation, even if the possessor did not intend it, depending on "what a *reasonable man would interpret the conduct to mean*." *Singleton*, 690 S.W.2d at 848. An "invitation 'may be implied from dedication, customary use, or enticement, allurement, inducement to enter or manifested by the arrangement of the premises or the conduct of the owner.'" *Schumacher*, 948 S.W.2d at 170 (quoting *Singleton*, 690 S.W.2d at 848); *see also, e.g.*, *Davidson v. Int'l Shoe Co.*, 427 S.W.2d 421, 423 (Mo. 1968); *Glaser v. Rothschild*, 120 S.W. 1, 3 (Mo. 1909) ("The word 'invitation' used in the rule covers and includes in it enticement, allurement, and inducement . . . . Also, the invitation may be implied by a dedication, or it may arise from known customary use." (citation omitted)).

Moreover, in this case, Ford Motor concedes that it extended Mr. Ford an invitation to enter the Kansas City Assembly Plant – it disputes only whether the invitation extended to the interior of the seat stripper system. An invitation extends to "the part of the land upon which the possessor [has] give[n] [a visitor] reason to believe that his presence is desired for the purpose for which he has come." RESTATEMENT (SECOND) OF TORTS § 332 cmt. l (1965). "In determining the area included within the invitation, the purpose for which the land is held open, or the particular business purpose for which the invitation is extended, is of great importance." *Id.* As explained in another treatise:

> The area of invitation extends to all parts of the premises to which the purpose may reasonably be expected to take the invitee, and to those which are so arranged as to lead the invitee reasonably to think that they are open to him or her. The test applied to determine whether or not a person is an invitee at the place of injury is whether the owner of the premises should have anticipated the presence of someone such as the injured person at that particular place on the premises.

62 AM. JUR. 2D *Premises Liability* § 99 (2019) (footnotes omitted). Other authorities similarly hold that, in determining the scope of an invitation, the critical question is

what a visitor would reasonably understand to be the areas to which he or she had been given access, based on all of the relevant circumstances, including the purpose of the visitor's visit; the possessor's statements and conduct; past use; and the physical layout of the premises.[4]

By asking the jury only whether Ford Motor had "given [Mr. Ford] permission to enter" the seat stripper system, Ford Motor's proffered instruction omitted other factors – such as Mr. Ford's reasonable belief based on Ford Motor's conduct; the physical layout of the premises; the customary use of the premises by Walkenhorst drivers; and whether Ford Motor could have reasonably anticipated Mr. Ford's presence – that were relevant to a determination of whether Mr. Ford was an invitee rather than a trespasser at the place of his injury. This provides an additional justification supporting the circuit court's rejection of Refused Instruction G.

Trial courts are "under no duty to draft a correct instruction" for a party requesting an instruction to submit their theory of the case. *Cluck v. Union Pac. R. Co.*, 367 S.W.3d 25, 34 (Mo. 2012); *accord Barth v. St. Jude Medical, Inc.*, 559 S.W.3d 923, 925, 927 (Mo. App. E.D. 2018); *SKMDV Holdings, Inc. v. Green Jacobson, P.C.*, 494 S.W.3d 537, 556 (Mo. App. E.D. 2016). The circuit court did not err in refusing to submit Ford Motor's proposed instruction concerning Mr. Ford's purported status as a trespasser.

---

[4]     *See, e.g.*, 65A C.J.S. *Negligence* § 524, at 343–45 (2010) (invitation includes areas "where the invitee may reasonably be expected to go, or where the owner or occupant ought in reason to understand that invitees would understand were for their use"; "An invitation may extend to those parts of the premises which are so arranged as to lead an invitee reasonably to think that they are open to the invitee."; "An invitation to do business extends . . . to all parts of the premises as it is reasonable for the visitor to believe are held open to the visitor, and in determining the area included in a business invitation, the nature of the business to be transacted is of great importance." (footnotes omitted)); W. PAGE KEETON ET AL, PROSSER AND KEETON ON TORTS § 61, at 424–25 (5th ed. 1984) (area of invitation "extends to all parts of the premises to which the purpose [underlying the invitation] may reasonably be expected to take him, and to those which are so arranged as to lead him reasonably to think that they are open to him" (footnotes omitted)).

Point III is denied.

## IV.

In Point IV, Ford Motor argues that the circuit court erred in denying its motions for directed verdict and for judgment notwithstanding the verdict, because the pinch point area was an open and obvious danger as a matter of law.

"[W]hen the dangerous condition is so open and obvious that the invitee should reasonably be expected to discover it and realize the danger, a possessor of land does *not* breach the standard of care owed to invitees 'unless the possessor should anticipate the harm despite such knowledge or obviousness.'" *Harris v. Niehaus*, 857 S.W.2d 222, 226 (Mo. 1993) (quoting RESTATEMENT (SECOND) OF TORTS § 343A(1) (1965)). "As a general matter, therefore, a possessor's actions do not fall below the applicable standard of care if the possessor fails to protect invitees against conditions that are open and obvious as a matter of law." *Harris*, 857 S.W.2d at 226; *see also Coomer*, 437 S.W.3d at 193 n.4 (Mo. 2014) ("even after comparative fault, the open and obvious nature of the risks is an issue for the court to use '*in determining a possessor of land's standard of care*'" (quoting *Harris*, 857 S.W.2d at 227) (emphasis added by *Coomer*)). An "obvious" danger is one in which "both the condition and the risk are apparent to and would be recognized by a reasonable man . . . exercising ordinary perception, intelligence, and judgment." *Smith v. The Callaway Bank*, 359 S.W.3d 545, 547 (Mo. App. W.D. 2012) (quoting RESTATEMENT (SECOND) OF TORTS § 343A(1) cmt. b (1965)).

Ford Motor argues that the dangers of the seat stripper should have been apparent to Mr. Ford if he was exercising ordinary perception, intelligence, and judgment, and that Mr. Ford was actually aware of those dangers. Ford Motor cites deposition testimony from a Walkenhorst driver who agreed that it was "common sense" not to stand in the pinch point area of the seat stripper. Ford Motor emphasizes that the area was guarded (on <u>one</u> side) by a bright yellow safety gate

which had an interlock that would turn the system off.  Finally, Ford Motor argues that the dangers of the seat stripper were actually known to Mr. Ford because a fellow Walkenhorst driver told him to stay out of the area less than a week before the incident.

The evidence in this case did not establish that the dangerousness of the pinch point in the seat stripper was open and obvious as a matter of law.  Although one or more witnesses may have testified to their personal belief that the dangerousness of the seat stripper system was open and obvious, the evidence also indicated that Ford Motor had failed to comply with its own policies, with industry standards, and with governmental regulations by failing to barricade, or post warning signs, on _both_ sides of the pinch point.  In particular, warnings or a barricade were lacking in the direction from which Mr. Ford entered the seat stripper, which the evidence indicated was a common means of entry.  In addition, one of Ford Motor's own employees testified that, although he was aware of the pinch point and its dangerous potential, he was almost injured by it within the six months before Mr. Ford's injuries, because "you get that tunnel vision" when performing a specific task in the middle of a noisy plant with a great deal of moving equipment.  Finally, one of the Plaintiffs' safety experts, Franklin Darius, testified that the erratic motion of the seat stripper and carrier system heightened its dangerousness:  "if [machinery] can stop for a long period of time and then suddenly move without warning, it'll catch people by surprise."

Ford Motor also contends that the evidence establishes that another Walkenhorst employee, Ken Holland, actually warned Mr. Ford about the danger of the pinch point approximately one week before Mr. Ford's fatal injury.  Although Holland testified that he warned Mr. Ford generally about the danger of being inside the seat stripper while the machinery was operating, he executed a written statement saying that he "did not explain to him about the pinch point or why it

26

was dangerous, but instead told him to just first shut off the machine before putting the seats back on the machine." Holland testified that although he did not advise Mr. Ford of the pinch point, "I would have hoped . . . [t]hat someone who trained him would have showed him the pinch points." In addition, Holland testified that in response to his advice that Mr. Ford should shut down the machine before attempting to clear jammed seats, Mr. Ford responded that "somebody else told him to keep it running." Thus, on Holland's own testimony, Mr. Ford had received conflicting advice as to whether or not he needed to shut down the seat stripper and carrier system before entering it.

The evidence failed to establish, as a matter of law, that the danger of the pinch point was open and obvious. The circuit court did not err in denying Ford Motor's motions for directed verdict and for judgment notwithstanding the verdict. Point IV is denied.

## V.

In its fifth Point, Ford Motor asserts that, even if the "open and obvious" issue did not entitle it to a directed verdict or judgment notwithstanding the verdict, it was entitled to a separate instruction telling the jury that its verdict must be for Ford Motor if the jury found that the danger of the pinch point was open and obvious.

This Court rejected this precise argument in *Privitera v. Coastal Mart, Inc.*, 908 S.W.2d 779 (Mo. App. W.D. 1995). In *Privitera*, as here, a defendant argued that the circuit court should have granted it a directed verdict because an injury-causing condition was open and obvious as a matter of law. In the alternative, the defendant argued that it was entitled to a separate instruction on the open and obvious issue. This Court rejected the defendant's argument that the dangerous condition was open and obvious as a matter of law. We then held that the defendant was not entitled to a separate instruction on the "open and obvious"

issue, but that the issue should instead be submitted to the jury as part of its consideration of comparative fault. We explained:

> The trial court did not err in refusing to submit this instruction to the jury because the issue regarding whether the condition was open and obvious is a question of law to be decided by the court. If the court finds the condition was, as a matter of law, open and obvious, the case is not submissible to the jury in the first place because the plaintiff has not established the failure to protect against the complained condition fell below the applicable standard of care. Thus, once the court has properly determined the condition was not open and obvious as a matter of law, the jury is to be instructed under normal comparative fault instructions, which was done in this case.

*Id.* at 782. We followed *Privitera* in *Williams v. Junior Coll. Dist. of Cent. Sw. Missouri*, 906 S.W.2d 400 (Mo. App. S.D. 1995), where we explained that, if a condition is not open and obvious as a matter of law, "then a plaintiff's knowledge [of a dangerous condition], or knowledge that the plaintiff should have, is considered in determining comparative negligence," and should not be the subject of a separate verdict-directing instruction. *Id.* at 403.

Point V is denied.

## VI.

In its sixth Point, Ford Motor argues that the trial court erred in submitting Instruction 14, which instructed the jury on the relevant standard for awarding aggravating circumstances damages.

"'Whether a jury is properly instructed is a matter of law' this Court . . . reviews de novo." *Johnson v. Auto Handling Corp.*, 523 S.W.3d 452, 459 (Mo. 2017) (quoting *Fleshner v. Pepose Vision Inst., P.C.*, 304 S.W.3d 81, 90 (Mo. 2010)). Instructional error is grounds for reversal if "the error resulted in prejudice that materially affects the merits of the action." *Hervey v. Missouri Dept. of Corr.*, 379 S.W.3d 156, 159 (Mo. 2012).

28

The circuit court's aggravated circumstances instruction, Instruction 14, was patterned after MAI 10.07. It provided:

> If you assess a percentage of fault to defendant Ford Motor Company under Instruction Number 8 and if you believe that
>
> First, defendant failed to remove or barricade an accessible pinch point in the seat stripper area of the Ford Kansas City Assembly Plant, and
>
> Second, ***defendant knew or had information from which defendant, in the exercise of ordinary care, should have known that such conduct created a high degree of probability of injury***, and
>
> Third, defendant thereby showed complete indifference to or conscious disregard for the safety of others,
>
> then, in Verdict A, you may find that defendant Ford Motor Company is liable for damages for aggravating circumstances.

(Emphasis added.)

Ford Motor argues that MAI 10.07 was the wrong instruction because the requisite knowledge element was already addressed in the underlying negligence instruction. Ford Motor contends that the circuit court should have submitted an aggravated circumstances instruction modeled after MAI 10.02, which states in relevant part:

> If you find in favor of plaintiff under Instruction Number _____ *(here insert number of plaintiff's verdict directing instruction based on negligence)*, and if you believe the conduct of defendant as submitted in Instruction Number _____ *(here insert number of plaintiff's verdict directing instruction based on negligence)* showed complete indifference to or conscious disregard for the safety of others, then in addition to any damages to which you may find plaintiff entitled under Instruction Number _____ *(here insert number of plaintiff's damage instruction)* you may award plaintiff an additional amount as punitive damages in such sum as you believe will serve to punish defendant and to deter defendant and others from like conduct.

Ford Motor argues that Instruction 14 had the effect of "emphasiz[ing] allegations of negligence, and bur[ying] the heightened standard the jury was required to use when awarding aggravating circumstances damages."

29

An instruction patterned after MAI 10.07 was the proper instruction in this case, because the highlighted language required the jury to find the level of knowledge necessary to support an award of aggravating circumstances damages, and that level of knowledge was not required by the underlying negligence instruction. In *Alack v. Vic Tanny Int'l of Missouri, Inc.*, 923 S.W.2d 330 (Mo. 1996), the Missouri Supreme Court held that a plaintiff's proffered punitive damages instruction, based on MAI 10.02, was inadequate when the underlying negligence instruction failed to include the requisite knowledge element. The court emphasized that, in order to justify an award of punitive damages, "[t]he evidence must show that, at the time of the act complained of, the defendant had knowledge of a high degree of probability of injury to a specific class of persons." *Id*. at 339 (citing *Kansas City v. Keene Corp.*, 855 S.W.2d 360, 375 (Mo. 1993)).

> The instruction submitted by plaintiff, however, failed to include this necessary element of knowledge. The instruction was patterned on MAI 10.02. The notes on use to MAI 10.02 . . . state that 10.02 is not to be used when the verdict directing instruction does not contain a submission on the issue of the defendant's knowledge. In this case, neither the verdict director, based on MAI 17.02, nor the proposed punitive damage instruction would have required the necessary finding by the jury of [the defendant's] knowledge. As clearly noted, MAI 10.07 should have been submitted instead.

*Id.*

In this case, as in *Alack*, the underlying negligence verdict director failed to include the state of mind required to support the award of punitive damages. Instruction 8 provided:

> In your verdict you must assess a percentage of fault to defendant Ford Motor Company if you believe
>
> First, plaintiffs Lisa Ford and David Jacob Ford were the wife and son of decedent David Ford, and
>
> Second, there was an accessible pinch point in the seat stripper area of the Ford Kansas City Assembly Plant and a result that spot was not reasonably safe, and

Third, ***defendant knew or by using ordinary care could have known of this condition***, and

Fourth, defendant failed to use ordinary care to remove or barricade it, and

Fifth, such failure directly caused or directly contributed to cause the death of David Ford.

(Emphasis added.) The knowledge required by Instruction 8 (that Ford Motor "knew or by using ordinary care could have known" of the unsafe condition in the seat stripper) is different from – *and lower than* – the knowledge required by *Alack* to justify a punitive damage award: "knowledge of a high degree of probability of injury to a specific class of persons." 923 S.W.2d at 339. In these circumstances, use of MAI 10.07, to require the jury to find the state of mind essential to an award of aggravating circumstances damages, was proper.[5]

Ford Motor also argues that Instruction 14 was erroneous because it purportedly submitted a different allegation of wrongdoing than Instruction 8. According to Ford Motor, "[i]n Instruction 8, Plaintiffs identify the *existence* of a pinch point as the fault," while in Instruction 14, "Plaintiffs allege Ford [Motor] failed to *remove or barricade* an access point." There is no variance between the misconduct alleged in Instructions 8 and 14. Paragraph "fourth" of Instruction 8 specifies that Plaintiffs' allegation is that Ford Motor "failure to use ordinary care to remove or barricade" the pinch point – precisely the same conduct on which Instruction 14 is predicated.

Point VI is denied.

---

[5]    Because the circuit court's aggravating circumstances instruction imposed on Plaintiffs a *higher* burden with respect to Ford Motor's state of mind than would have been required by MAI 10.02, we question whether Ford Motor could have established prejudice from the court's submission of Instruction 14, even if that instruction were otherwise erroneous.

31

# VII.

In its final Point, Ford Motor argues that the trial court erred in admitting evidence of other incidents in which Ford Motor or Walkenhorst employees were injured, or nearly injured, in the pinch point in the seat stripper. These incidents (which we have described in greater detail in our statement of the facts) included a 1996 incident in which Ford Motor employee Stephen Bray was caught in the pinch point, and suffered a broken rib; a 2015 incident in which another Ford Motor employee, Timothy Van Vickle, was advised to step back from the pinch point by his supervisor, and narrowly avoided being crushed; and another 2015 incident in which a Walkenhorst driver, Sal Cangelosi, suffered minor injuries when he was hit by a carrier in the pinch point area, but avoided more serious injuries due to a warning from, and intervention by, another Walkenhorst driver.

"Trial courts have 'wide discretion on issues of admission of evidence of similar occurrences.'" *Johnson*, 523 S.W.3d at 468 (citation omitted). We review a trial court's admission of such evidence to determine "that the evidence was relevant and that the occurrences bore sufficient resemblance to the injury-causing incident, while weighing the possibility of undue prejudice and confusion of issues." *Id.* (quoting *Newman v. Ford Motor Co.*, 975 S.W.2d 147, 151 (Mo. 1998)). "To be sufficiently similar, each occurrence must: (1) be of like character; (2) occur under substantially the same circumstances; and (3) result from the same cause as that alleged to have caused the accident in question." *Peters v. Gen. Motors Corp.*, 200 S.W.3d 1, 10 (Mo. App. W.D. 2006) (citing *Lopez v. Three Rivers Elec. Co-op. Inc.*, 26 S.W.3d 151, 159 (Mo. 2000)); *see also Johnson*, 523 S.W.3d at 468. "Particularly where the evidence is sought to be admitted on the issue of notice, 'the similarity in the circumstances of the accidents need not be completely symmetrical.'" *Johnson*, 523 S.W.3d at 468 (quoting *Pierce v. Platte-Clay Elec. Co-op.*, 769 S.W.2d 769, 774 (Mo. 1989)); *accord Emery v. Wal-Mart Stores, Inc.*, 976 S.W.2d 439, 446 (Mo. 1998).

The proponent probably will want to show directly that the defendant had knowledge of the prior accidents, but the nature, frequency or notoriety of the incidents may well reveal that defendant knew of them or should have discovered the danger by due inspection. Since all that is required is that the previous injury or injuries be such as to call defendant's attention to the dangerous situation that resulted in the litigated accident, the similarity in the circumstances of the accidents can be considerably less than that which is demanded when the same evidence is used for one of the other valid purposes.

*Stacy v. Truman Med. Ctr.*, 836 S.W.2d 911, 926 (Mo. 1992), abrogated on other grounds by *Southers v. City of Farmington*, 263 S.W.3d 603 (Mo. 2008).

As a case alleging negligence for a dangerous condition on business premises, Ford Motor's notice of the dangerous condition was a key issue in determining its liability. In order for Plaintiffs to make a submissible case, they needed to show that Ford Motor had actual or constructive knowledge of the dangerous condition (the pinch point). *See Breckenridge v. Meierhoffer-Fleeman Funeral Home, Inc.*, 941 S.W.2d 609, 611 (Mo. App. W.D. 1997). Thus, the verdict director, Instruction No. 8 stated, in relevant part:

Second, there was an accessible pinch point in the seat stripper area of the Ford Kansas City Assembly Plant and as a result that spot was not reasonably safe, and

Third, **defendant knew or by using ordinary care could have known of this condition**.

As the Missouri Supreme Court has stated:

Where the theory of recovery is negligence, any knowledge or warning that defendant had of the type of accident in which plaintiff was injured clearly aids the jury in determining whether a reasonably careful defendant would have taken further precautions under all the facts and circumstances, which include the knowledge of defendant of prior accidents.

*Stacy*, 836 S.W.2d at 926. "To establish constructive knowledge or notice, the [dangerous] condition must have existed for a sufficient length of time or the facts must be such that the defendant should have reasonably known of its presence."

*Porter v. Toys 'R' Us-Delaware, Inc.*, 152 S.W.3d 310, 316 (Mo. App. W.D. 2004).

33

The previous incidents involving Bray, Van Vickle, and Cangelosi all had sufficient similarity to be admitted as similar occurrences because the incidents were of "like character," occurred "under substantially the same circumstances," and resulted "from the same cause as that alleged to have caused the accident in question." *Peters*, 200 S.W.3d at 10. The previous incidents all involved persons who were working at the Kansas City Auto Plant within the scope of their employment, and who were injured, or nearly injured, at the same pinch point in the seat stripper as Mr. Ford, while they were working to maintain or service the seat stripper as it was operating.

Ford Motor argues that the incidents involving Bray and Van Vickle, who were both Ford Motor employees, are dissimilar because only employees were authorized to enter the seat stripper. But as we have explained in § II above, Plaintiffs presented sufficient evidence to support a jury finding that Walkenhorst drivers like Mr. Ford were likewise authorized – and even expected – to enter the seat stripper.

Although Ford Motor argues that the Bray incident is distinguishable because a safety gate was installed after his injury, Plaintiffs presented substantial evidence that the gate was insufficient because it failed to guard the pinch point from the direction in which workers most commonly approached it.[6] While Van Vickle was not injured in the "near miss" incident in which he was involved, his experience (witnessed by a supervisory Ford Motor employee) supported a finding that Ford Motor was, or should have been, aware of the equipment's dangerousness. And despite Ford Motor's contrary claims, there was sufficient evidence that Ford

---

[6] Because it is otherwise sufficiently similar, the fact that the Bray incident occurred twenty years earlier goes to the weight of the evidence, not its admissibility. *Lopez v. Three Rivers Elec. Co-op., Inc.*, 26 S.W.3d 151, 159–60 (Mo. 2000).

Motor employees – who had an obligation to report such incidents to the company's safety department – were aware of each incident.[7]

The circuit court did not abuse its "wide discretion" in admitting evidence concerning the Bray, Van Vickle, and Cangelosi incidents. Point VII is denied.

### Conclusion

The judgment of the circuit court is affirmed.

_____
Alok Ahuja, Judge

All concur.

---

[7] Ford Motor argues that the testimony of Cangelosi and another Walkenhorst driver, that they told a Ford Motor maintenance worker about the incident in which Cangelosi was involved, was inadmissible hearsay. This testimony was not hearsay:

> Where the issue is what the defendant's agents heard[,] . . . state of mind testimony is not offered to show the truth of the statements made. Instead, it is offered to show the fact that the statements, whether true or false, were made to defendant and, as a result, defendant had notice of a potentially dangerous condition prior to any injury. State of mind testimony in this category is not admitted as an exception to the hearsay rule. It is admitted because it is not hearsay.

_Bynote v. Nat'l Super Mkts., Inc._, 891 S.W.2d 117, 121 (Mo. 1995).